# JAMES THOMAS & al. vs. GEORGE W. PICKERING & als.

D., being the owner of five-eighths of an original settler's right in a two hundred and twenty-five acre lot in *Bangor*, in 1798, by deed of warranty conveyed to R. one acre thereof, describing it particularly by metes and bounds. In 1801 R. conveyed the same acre by the same description to H.; and H. in 1822, conveyed the same, in a large number of lots, to the respondents, or to others under whom they claim. All these deeds were recorded immediately after they were given. In 1800 D. made a deed to the petitioner, T., describing the whole 225 acre lot, and then saying, " of which only five-eighths are the property of said D, and are hereby conveyed, with the exceptions of" three pieces described, containing in the whole about twelve acres, one of which pieces was the *acre* conveyed to R., and then adding, " *which exceptions are made out of the five-eighths conveyed, as aforesaid.*" In 1803, T. and the owners of the three-eighths of the whole lot, made a partition of all the land, but the *acre* and the other two excepted pieces, in which partition the owners of the three-eighths had assigned to them *their full share in the whole of the 225 acre lot.* T. released to the owners of the three-eighths, his interest in the land assigned to them, and they released to him their three-eighths in all the residue. In 1802, a committee authorized by a resolve of the legislature of the Commonwealth of *Massachusetts*, conveyed the lot to the heirs of the first settler. Soon after H. received and recorded his deed, he entered into the occupation of a part of the acre, and he and his grantees continued the occupation to the present time, covering the principal part of it within the last twelve years with buildings. During a portion of this time T. acted as the agent of H. in leasing the land. In 1834, T. entered upon the land, and instituted this process of partition. *It was held:*

That by the deed from D. to T. *the whole* of the excepted pieces was reserved out of the five-eighth parts, and was to be considered, as so much received of the interest to be assigned to those shares, when partition should be made :

That the effect of the deeds of release was but to make partition of the 225 acre lot :

That T., having taken a deed from D. conveying him only so much as remained of the five-eighths after deducting therefrom the whole of the excepted pieces, acquired by the deed of release, made on the partition, no title in himself in the three-eighths of those pieces :

And that the deed from the State did not vary the rights of those claiming under the first settler, further than relinquishing the right of the State.

One tenant in common *may* oust his co-tenant by resisting or denying his right or by excluding him from the enjoyment of it; and an interest thus acquired may become indefeasible by an uninterrupted continuance for a sufficient time.

A deed of warranty given by one tenant in common in possession to a stranger who records his deed and enters and occupies a part thereof, the residue remaining vacant, ousts the co-tenants of the grantor, and puts the grantee in the seisin of the whole; and he becomes entitled to the protection of the statute of limitations against all conflicting rights.

THIS was a petition for partition in which the petitioners alleged, that they were seised in common, with persons unknown, of three undivided eighth parts of an acre of land in the city of *Bangor*, described in their petition. Certain persons appeared as respondents, and severally pleaded sole seisin in certain portions of the acre, described in their pleas, and traversed the seisin of the petitioners alleged in their petition, and upon these pleas issues were joined. The petitioners adduced in evidence a deed dated *April* 2, 1803, acknowledged *April* 4, and recorded *May* 4, of the same year, from *Isaac Hatch, Moses* and *Amos Patten & Nathaniel Harlow*, guardian of *Vinson Dunning*, a *non compos*, to the petitioners of their interest in 42 lots of land, and among others of lot No. 73, according to a plan made by *Moses Hodsdon, May* 14, 1801 ; also the said plan, it appearing that lot No. 73, embraced within itself most of the acre, of which partition. was prayed; also a deed dated *August* 5, 1800, from *Andrew Dunning* to *Moses* and *Amos Patten*, of his interest in the estate of his father, *James Dunning*, deceased, being one eighth part, also a deed, dated *April* 4, 1804, from *John Dunning*, another of the heirs of *James Dunning*, of his eighth, to *Isaac Hatch*. It appeared that *Vinson Dunning*, was another heir, and entitled to one eighth. It was agreed that *James Dunning*, the father, was an original settler in *Bangor*, that the acre in question was a part of his possession, and that he was entitled to the favor of the government, under a resolve of the Commonwealth of *Massachusetts*. The petitioners produced a deed, dated *November* 11, 1802, from a committee of the Commonwealth, conveying to the heirs of *James Dunning*, deceased, certain lands, of which he died possessed, of which the acre formed part. It was admitted that *James Dunning*, the father, died intestate, prior to *January*, 1790, leaving *James Dunning*, his oldest son, and six other children, his heirs at law. *James*, the son, by the law as it then stood, was entitled to two shares, and it appeared from a deed in the case, that on the 14th of *October*, 1793, he acquired by purchase from *Elijah Smith* and *Anne* his wife, a daughter of the deceased, in her right, and from *Robert Dunning & William Dunning*, his brothers, their three-eighths, by which he became the owner of five-eighths of the estate. The respondents pro-

duced a deed dated *June* 1, 1800, from *James Dunning,* the son, and wife, to the petitioners of his five-eighths. This deed describes a tract of land containing two hundred and twenty-five acres, and then says, "of which only five-eighth parts common and undivided is the property of the above named *James Dunning* and is hereby conveyed ; with the exceptions of about ten acres conveyed to *William Hammond,*" describing the ten acres ; "and also one acre conveyed by deed to *Rice,*" describing it in the language of the deed to *Rice ;* also another tract described, and proceeds, " which exceptions are reserved out of the five eighths conveyed, as aforesaid," " to have and to hold the aforegranted premises, *viz.* five-eighth parts thereof with the exceptions as above described," that I am lawfully seised, &c., "of the five-eighths with the exceptions aforesaid," and continuing the same expressions in all the covenants.

Also a deed of warranty, dated *October* 1, 1798, acknowledged the 2d, and recorded the 8th of the same *October,* from *James Dunning,* the son, conveying the acre by metes and bounds to *Thomas Rice,* also a deed of release, dated 11th of *November,* acknowledged *November* 12, and recorded *December* 30, 1801, of the same acre, by the same bounds to *Jonathan Hyde.* And it was admitted, that the title of *Hyde* had passed to the respondents, in the proportions by them claimed. *Daniel Ladd* testified, that in 1798, *James Dunning,* the son, improved and occupied a field which included the acre, which he that year sold to *Thomas Rice,* who paid him a horse therefor. The deposition of *Jonathan Hyde,* the grantee of *Rice,* was read : which stated in substance, that he purchased the land in *Bangor* known as the *Rice* or *Hyde* acre in 1801 ; laid it out in lots in 1822 ; and soon after sold out to various individuals ; that he resided at *Bath,* and was in *Bangor* in 1807, in 1813, and in 1822; that he paid the taxes or caused them to be paid ; that although he had no recollection of appointing *James Thomas* his agent, as early as 1810, yet he finds a lease in his possession dated in that year from said *Thomas,* as his agent, to one *Reynolds,* and that he approved of the transaction, and received rents under the lease from time to time ; that the acre was unoccupied, except where there were buildings : that he thinks he appointed *Mr. William*

*Emerson,* about 1815, his agent to take care of the land and pay taxes, but has not a distinct recollection about it; that during the time, he never knew *Thomas,* who is his brother-in-law, or any one else, claim the land, or any of it, included within the description in the deed, but that after his survey in 1822, *Thomas* said he should for himself, or others, claim all that the deed did not give the deponent; that *Thomas* never claimed any interest in the lot covered by the deed, while the deponent owned the land; and that he had always claimed the entire ownership of the whole acre. ·

*Abner Taylor* testified, that he became acquainted with the land in question, in 1802 or 1803, and that it was then known by the name of the *Hyde* acre; that *Thomas,* one of the petitioners, stated to him that he purchased the acre for *Hyde,* who was his brother-in-law, that he went to the county of *Worcester,* and had a jaunt to find *Rice,* the owner. That in 1810, he and *Moses* and *Amos Patten* built a vessel, on the shore of the acre; that while she was on the stocks, *Thomas* said he had called upon *Patten* for pay for the use of the land, who was unwilling to give any thing; that *Thomas* said ·he was an agent, and had the care of the land for *Hyde;* that it made no difference to him, but he thought *Hyde* ought to have something. The witness added, that nothing was paid for the land, so far as he knew, and that *Thomas* never claimed the land, as his, to his knowledge. *John Reynolds* testified, that on the third of *October,* 1810, he took a lease of a part of the acre, to set a shop upon. The lease was under the hand of *Thomas,* was written by him, professing to act as the agent of *Hyde,* and had a seal affixed thereto. An account between him and *Hyde* for rent was introduced and verified by the witness. The witness testified, that the following year, he built a shop on the land he hired; that he sold the shop to one *Pray,* who paid ground rent therefor; *Pray* sold to *Simon Harriman,* who paid ground rent; that *Harriman* sold to *Thomas A. Hill,* under whom the witness hired and occupied the shop from 1818 to 1827, when he repurchased the shop; that it remained on the land, where it was first placed, until 1827, when *John Sargent* and another, who had purchased the land of *Hyde,* began to dig their cellar, at whose request he removed the

shop off, and they thereupon put on the same spot a wooden store, which remained thereon until it was burnt in *July*, 1834 ; that there were, before the fire, wooden buildings from where his shop was, to the end of the acre, and upon the opposite side except an avenue ; that *Fisk & Billing's* wooden store, built in 1824, and *Thomas F. Hatch's*, both on the acre, were not *burnt*, but are still standing. And that his shop was the first building on the acre, except *Simon Harriman's* blacksmith's shop, which stood west of main-street, on or near the scite of the old *Bangor Bank*. *David Hill* testified, that in 1813, he got permission of *William Emerson* to put up hayscales, of the fashion of that day, on a part of the acre ; that *Emerson*, when he gave liberty told him he must settle with *Hyde*, and was referred to him to determine what ground rent he should pay. What *Emerson* said was objected to, but admitted. That he soon after saw *Hyde*, to whom he paid rent from time to time, so long as they remained, $3,00 a year at first, and afterwards he believed $5,00 a year ; that in 1827, at the request of *George W. Pickering*, who had bought the land of *Hyde*, he removed the hayscales off, and *Pickering* put up a building on the same place. *Thomas Bartlet*, who had sold the hayscales to *Hill*, testified that he was positive they were put up in 1813. *Benjamin Weed* testified, that in 1820 or 1821, *William Emerson* gave him and one *Davis* permission to put up a shop, on a part of the acre, *Emerson* saying at the time, that *Hyde* would soon be here, and settle the price ; that they built their shop, and *Hyde* came soon, and gave them a lease ; and that their shop remained until *Pickering*, who had bought the land, required him to remove it, who thereupon built on the same place. The witnesses before mentioned were adduced in behalf of the respondents.

For the petitioners,

*Jacob Chick* testified, that in 1802 he hired of *Thomas* a portion of the *Hyde* acre, paying him therefor, three or four dollars a year, in building for him a chimney in his store ; that he put upon and inclosed the upper part of the acre with a fence of stakes, boards and withes, and cut grass there two or three years ; that he thought he understood at the time, that *Hyde* owned the acre,

probably from *Thomas*, but upon further examination stated, that he could not say he heard him say any thing about it.

*Simon Harriman* testified, that prior to 1807, he had a blacksmith shop standing upon land belonging to *James Thomas*, not part of the acre, that in 1807 it was carried off by a freshet. That afterwards *Thomas* asked him, if he was going to rebuild, and that he replied he would not put his shop again, where it would go adrift, whereupon *Thomas* told him that he had a piece of land, where it would be safe, and accordingly gave him permission to set his shop, which he did, west of main-street, on the acre, on or near the scite of the *Bangor Bank*; that he was to give *Thomas* $2,00 a year, and he supposed he paid him for the time his shop stood there; that it remained until about the year 1818, when he removed it across the street to make way for the bank; that prior to 1807, he had heard about the *Hyde* acre; thought *Thomas* might have spoken of it, but could not recollect with certainty; that twenty-two or twenty-three years ago, but was not certain, whether during the late war, or before or after, he tried to purchase of *Hyde* the land upon which his shop stood, but thinking his price too high, he did not buy it. He further testified, that he did not see *Thomas*, after he left here in 1812, until he went to *Houlton* in 1828. *Simon B. Harriman* testified, that he is now 40 years of age, and that he came to *Bangor* thirty-three years ago; that the shop of his father, the last witness, stood on or near the scite of the old bank, and was removed to make way for the bank, which was built in 1818; that it afterwards stood upon the opposite side of the street, upon another part of the acre, for which he thought he once paid *Hyde* rent at *Bath*; that he had known the *Hyde* acre ever since he came to *Bangor*, and that he had understood it was purchased for a horse. *Alvin Haines* testified, that on the 24th of *February*, 1834, he went with *Thomas*, who there in his presence made a formal entry into every part of the acre, which was in a several occupation.

On making the partition, the lots assigned to each party were marked on the plan, number 73 not being drawn or marked; and three-eighths of the whole 225 acre lot were assigned to the three shares.

Thomas *v.* Pickering.

The counsel for the petitioners requested *Weston C. J.*, before whom the trial was had, to instruct the jury : 1. That if the petitioners took a deed of the three-eighths, and put it upon record, and thereby became seised, and *Hyde* afterwards entered and occupied a part of the acre, it would not be a disseisin of the petitioners of the whole acre. 2. That the entry and occupation of *Reynolds*, under the lease given by *Thomas*, as attorney, being by the agency or consent of *Thomas*, was not a disseisin of *Thomas* of any part. 3. If of any part, it was not of the whole. 4. If *Hyde* intended to claim no more than he had title to, and entered and occupied, supposing, by mistake of his legal rights, that he owned the whole, this would not be a disseisin of the petitioners. 5. That to constitute a disseisin, the occupancy must be adverse to the owner. 6. That if *Hyde's* occupying was by *Thomas'* consent, it was no disseisin. 7. That if *Chick* went on under *Thomas'* agency, and there is no evidence of the revocation of such agency, it may be presumed to have continued as long as *Chick* continued. 8. If *Chick's* whole occupancy was by *Thomas'* agency, then *Thomas* might take a deed, while it continued. 9. That if *Thomas* told *Taylor* that he acted as the agent of *Hyde*, in purchasing the land, it was not evidence that he acted as agent, when he put *Harriman* in possession, in 1807. 10. That the petitioners' title commenced, when they caused a plan to be made, with a view to a partition.

The Chief Justice instructed the jury, that the deed made by *Dunning*, the son, to *Rice*, being a deed of warranty and recorded, as was also the deed of *Rice* to *Hyde*, conveying the *Hyde* acre in severalty, by metes and bounds, if the grantees or either of them thereupon entered into any part of the acre and occupied it, it would be a disseisin of the other co-tenants ; that the petitioners' interest, if any they had, in the three-eighths claimed by them did not commence prior to *April* 2, 1803, when they took their deed of release; that if *Thomas*, when he put *Chick* into possession of the acre or part of it, acted as the agent of *Hyde*, his brother-in-law, of which they would judge from all the testimony in the case, bearing upon that point, and *Chick* thereupon entered under *Hyde*, and was thus holding under him on the 2d of *April*, 1803, the other co-tenants were disseised,

and that therefore nothing passed by their deed of release of that date to the demandants; that if not satisfied upon that point, that by the entry of *Reynolds* under *Hyde* in 1810, and the continued occupancy of a part or parts of the acre under *Hyde*, for more than twenty years prior to the entry of the demandants, on the 24th of *February*, 1834, they were disseised, and their title thereby defeated, unless they or either of them had a concurrent possession, by the occupancy of *Simon Harriman*; that it hence became important for the jury to determine, whether *Thomas*, when he put *Harriman* on and suffered him to remain there, did, or did not act as the agent of *Hyde*; that of this they would judge from the whole evidence having relation to this point; that what *Thomas* told *Taylor*, that he purchased of *Rice* for *Hyde*, in 1801, and his representation to him that he was his agent in 1810, was evidence upon this point to be considered by them, with the other testimony; that it appearing from *Hyde's* deposition, and from other evidence, that he claimed the whole acre, and having a warranty of the whole, through *Rice*, there did not appear any such mistake of his rights, as would impair his title to the acre, and that if *Harriman* entered and held under him, *Hyde*, the demandants had no right of entry in 1834. Upon the points requested, the Chief Justice gave no other instructions than the foregoing. The jury returned their verdict for the respondents. If the instructions given were erroneous, or those requested and withheld ought to have been given, or the testimony of *Hill*, objected to, ought not to have been received, the verdict was to be set aside, and a new trial granted; otherwise judgment is to be rendered thereon, unless the same should be set aside, as a verdict against evidence.

There was a motion to set aside the verdict, as against evidence.

The case was elaborately argued by *Mellen* and *Rogers*, for the petitioners, and by *J. Appleton* and *Starrett* for the respondents.

In the arguments for the petitioners it was said:

1. That when the petitioners purchased the rights of three of the heirs of *James Dunning*, senior, they became tenants in common in the whole of the land, and had their election either to

seek partition in the whole, as one lot, regardless of any division by another tenant in common, or might call for a partition in each lot. The other co-tenants could do nothing to impair these rights, but the petitioners were under no necessity of enforcing them. They went on and made partition of all but this acre, but the other shares in this being sold out to a different person, at a distance, no partition was made of it. They had the power of defeating the title under *Rice* entirely, unless on the partition it fell to the share of those who had sold to him, when it might enure to his benefit. The petitioners were willing to accommodate, but they gave up no rights in this portion of the common property by making partition of the residue. *Gordon* v. *Pearson*, 1 *Mass. R.* 324; *Porter* v. *Hill*, 9 *Mass. R.* 34; *Bartlett* v. *Harlow*, 12 *Mass. R.* 348; *Baldwin* v. *Whiting*, 13 *Mass. R.* 57; *Rising* v. *Stannard*, 17 *Mass. R.* 282.

2. As the respondents have no paper title to but five-eighths of the land, they seek to take it from us, who have it, in some mode or other; and insist, that because the *Hyde* acre was excepted in *Dunning's* deed to us of the five-eighths, that it transfers the title to them. But it must be remembered, that neither the grantor, nor the grantees had at that time any title to this acre. The one had sold out, and the others had not purchased in. It is not easy therefore to imagine how such consequence can follow. Having made a conveyance of his interest in these lots, he made an exception of them in this deed, the only effect of which was to render the deed what it would have been, if these lots had been excluded, instead of being included, and excepted out. An exception can only be out of what otherwise would have been conveyed, 4 *Com. Dig.* 288; *Hornbeck* v. *Westbrook*, 9 *Johns. R.* 73; 10 *Coke's R.* 106.

3. If the petitioners could be considered, as trustees of the land for the respondents, it would afford them no defence in this process. The legal estate would be in us, and they would be put to their bill in equity. 4 *Kent's Com.* 289. But that there is a trust of any description is wholly denied. The petitioners never derived any title in the acre by their deed from *James Dunning*; they then had no title in it from any source, and they now claim under a distinct title. 4 *Kent's Com.* 289; *Fisher* v.

*Fields,* 10 *Jahns. R.* 495 ; *Steeve* v. *Steeve,* 5 *Johns. Ch. R.*
1 ; *Philips* v. *Brydges,* 3 *Vesey,* 127 ; 4 *Kent's Com.* 305 ;
*Morvan* v. *Hays,* 1 *Johns. Ch. R.* 339 ; *Goodwin* v. *Hubbard,*
15 *Mass. R.* 210.

4. There is no foundation for saying, that here is a resulting
trust, implied by law.  Payment at the time is indispensable to
the creation of such trust ; and it exists only, where the consid-
eration of the purchase is paid by one man, and the conveyance
made to another; or where the trust is declared in writing in
part, and there is a resulting trust of the residue to the heir at
law.  *Lloyd* v. *Spillett,* 2 *Atkins.* 150 ; *Willis* v. *Willis, ibid.*
71 ; *Bartlett* v. *Pickersgill,* 1 *Eden's R.* 515 ; *Botsford* v.
*Burr,* 2 *Johns. Ch. R.* 405 ; *Sterrett* v. *Sleeve,* 5 *Johns. Ch.
R.* 1 ; *Howell* v. *Monson & B. Man'g Co.* 3 *Mason,* 362 ;
*Radley* v. *Shaver,* 4 *Johns. Ch. R.* 300 ; 4 *Kent's Com.* 306.

5. There is no reason for saying, that a title was gained by
disseisin, or that there was such an adverse possession, when we
took our deed, as would prevent the title from passing.   The
doctrine of disseisin is spread over a broad surface ; but one prin-
ciple seems to be clearly established, which is, that there can be
no disseisin, unless the commencement of it was a trespass.
Mere sole occupancy is not sufficient.   In the language of *Chan-
cellor Kent,* " Every disseisin is a trespass, but every trespass is
not a disseisin.   A manifest intention to oust the real owner
must clearly appear, in order to raise an act which may be only
trespass to the bad eminence of disseisin." 4 *Kent's Com.* 2*d
Ed.* 482 *to* 489 ; *Harrison* v. *Philips' Academy,* 12 *Mass. R.*
456 ; *Little* v. *Libby,* 2 *Greenl.* 242 ; *Pro. Ken. Pur.* v. *Lab-
oree, ibid.* 275 ; *Robison* v. *Swett,* 3 *Greenl.* 316 ; *Stearns on
Real Actions,* 39 ; *Shumway* v. *Holbrook,* 1 *Pick.* 114 ; *Ricard*
v. *Williams,* 7 *Wheat.* 59 ; *McClung* v. *Ross,* 5 *Wheat.* 116 ;
*Barnitz* v. *Casey,* 7 *Cranch.* 456 ; *Carruthers* v. *Dunning,* 3
*Serg. & R.* 373 ; *Peaceable* v. *Read,* 1 *East,* 568 ; *Bigelow* v.
*Jones,* 10 *Pick.* 161 ; *Prescott* v. *Nevers,* 4 *Mason,* 326 ; *Ross*
v. *Gould,* 5 *Greenl.* 204 ; *Tinkham* v. *Arnold,* 3 *Greenl.* 120 ;
*Fox* v. *Widgery,* 4 *Greenl.* 214 ; *Dennett* v. *Crocker,* 8 *Greenl.*
239 ; *Schwartz* v. *Kuhn,* 1 *Fairf.* 274.

6. But none of the parties had any title to the land, before the deed from the Commonwealth to the heirs of *Dunning*, in 1802, which made them all tenants in common according to their respective rights. *Little* v. *Megquier*, 2 *Greenl.* 176; *Polk* v. *Wendell*, 5 *Wheat.* 308; *Sampeyreac* v. *U. States*, 7 *Peters*, 222; *Knox* v. *Pickering*, 7 *Greenl.* 106; *Ricard* v. *Williams*, 7 *Wheat.* 59.

7. The occupancy of the persons put in by *Thomas* could be no disseisin of him; but if it could, it would extend only to the small parcels occupied, and not to the rest. *Oakes* v. *Marcy*, 10 *Pick.* 195; *Pro. Ken. Pur.* v. *Laboree*, 2 *Greenl.* 275.

In the arguments for the respondents, it was said; that they held under a warranty deed of the whole of the tract, in which there were definite and well known boundaries, and that the deed was recorded more than thirty years before the entry of the petitioners; and that actual possession had accompanied the deed. A portion of the land was covered with buildings soon after the deed was given, and long since nearly the whole was covered with buildings and streets. An agent for the respondents attended to paying the taxes and taking care of the land. All the title the petitioners set up accrued more than thirty years before their entry, and during the whole time the present claimants had full knowledge of all these facts, and were in a situation to enforce any rights they had for the whole period; and yet stood by and saw the respondents making very valuable improvements, without giving the slightest intimation, that they had any title.

1. They have not exhibited sufficient evidence to put us on our defence. Their own testimony shews, that we were in possession when they took their deeds, which were mere deeds of release; given by persons not in possession to persons in the same condition. Nothing passed by these deeds. *Pro. Ken. Pur.* v. *Call*, 1 *Mass. R.* 483; *Porter* v. *Perkins*, 5 *Mass. R.* 233; *Warren* v. *Childs*, 11 *Mass. R.* 22; *Mayo* v. *Libby*, 12 *Mass. R.* 339; *Hathorne* v. *Haines*, 1 *Greenl.* 238; *Quarles* v. *Quarles*, 4 *Mass. R.* 680; *King* v. *Barnes*, 13 *Pick.* 24.

2. If the petitioners have any strict rights, an attempt to enforce them against the respondents, under the circumstances of this case, is a legal fraud, which the courts will not countenance

or suffer to be enforced. *Lapish* v. *Wells*, 6 *Greenl.* 175; *Dunlap* v. *Stetson*, 4 *Mason*, 349.

3. By the deed from *James Dunning* to the petitioners, if they took any thing, it was only his five shares in the land not before conveyed, less by the amount of the value of the three-eighths by him previously conveyed, which by the terms of the deed was to be taken out of the remaining five-eighths. And on the partition the owners of the three-eighths actually received an equivalent for any right they might have had in the lands previously sold. The effect of this was a resulting trust for the benefit of those to whom *Dunning* had previously conveyed in fee. This trust is not within the statute of frauds; nor can the trustee set up the title to oust the equitable owner. *Scoby* v. *Blanchard*, 3 *N. H. Rep.* 170; *Pritchard* v. *Brown*, 4 *N. H. Rep.* 397; *Hempstead* v. *North Hempstead*, 2 *Wend.* 109; *Comstock* v. *Smith*, 13 *Pick.* 116. It has been said, that an exception can be only made out of the estate, which would otherwise have been conveyed. This is precisely our ground, that the exception was made out of the five-eighths of the remaining lands, which otherwise would have passed.

4. The entry into the land under a recorded *deed of warranty*, and the possession of it for more than twenty years, exercising all the acts of ownership over it, incurring liabilities by paying taxes and keeping an agent in the neighbourhood to take care of it, the petitioners making no entry or claim during the time, in themselves give an indefeasible title against all persons, and especially against the petitioners, who were conusant of the whole facts. *Farrar* v. *Eastman*, 1 *Fairf.* 191; *Pro. Ken. Pur.* v. *Laboree*, 2 *Greenl.* 275; *Robison* v. *Swett*, 3 *Greenl.* 316; *Town* v. *Needham*, 3 *Paige*, 545; *The King* v. *Butterton*, 6 *T. R.* 556; *Prescott* v. *Nevers*, 4 *Mason*, 326; *Bradstreet* v. *Huntington*, 5 *Peters*, 402; 13 *Serg. & R.* 356; *Jackson* v. *Smith*, 13 *Johns. R.* 426; *Clap* v. *Brompton*, 9 *Cowen*, 530; *Rickard* v. *Rickard*, 13 *Pick.* 251; *Doe* v. *Prosser*, *Cowper*, 217; *Cummings* v. *Wyman*, 10 *Mass. R.* 464; *Bogardus* v. *Trinity Church*, 4 *Paige*, 200; *Jackson* v. *Tibbetts*, 9 *Cowen*, 251.

5. The fact, that the Commonwealth had not conveyed until after the deed to *Rice* cannot aid the petitioners. Before that conveyance, a title by disseisin, by deed, or by any other mode of acquiring title, would be good against all but the Commonwealth. In this case the resolve of the Commonwealth is but saying to the settlers, depend on your own rights, independently of us, and we will not interfere. *La Frombois* v. *Jackson*, 8 *Cowen*, 603 ; *Prop. No. 6* v. *Jones*, 12 *Mass. R.* 334 ; *Hill* v. *Dyer, 3 Greenl.* 441 ; *Jackson* v. *Vermilyea*, 6 *Cowen*, 667.

The action was continued for advisement, and the opinion of the Court was prepared and delivered at a subsequent term in *Cumberland* by

WESTON C. J. — *James Dunning*, the younger, being the owner of five-eighths of a tract of land, containing two hundred and twenty-five acres, sold to different persons ten acres, one acre and an eighth of an acre, part of the same tract, by metes and bounds. These sales did not conclude his co-tenants ; and were liable to be defeated by them. But as the quantity sold was far short of the proportion to which he was entitled, he might well entertain a just expectation, that these parcels would be assigned to his right, when partition was made, and thus his sales become confirmed. He ventured to rely upon a spirit of accommodation, on the part of his co-tenants.

*He subsequently sold his five-eighths in the whole tract*, describing it, to the petitioners, excepting therefrom the parcels before sold. Had the terms of the exception stopped there, there might have been some color for the position, that the exception was only of five-eighths of those parcels. But that his meaning, in his deed to the petitioners, might not be misunderstood, he adds, "which exceptions are reserved out of the five-eighths, conveyed as aforesaid." This language is plain and intelligible. It cannot easily be misunderstood. The parcels sold being reserved out of the five-eighths, the residue was conveyed to the petitioners. He had given deeds of warranty to his prior grantees ; and in selling the residue, he meant to make provision, that they should not be disturbed. In order to carry into effect the plain intent of the parties, it must have been contemplated,

that in any partition which might be made, the parcels excepted would be assigned as part of the five-eighths; and that the petitioners, or whoever might claim under them, would be entitled to the residue of that proportion of interest, to be set off to them in severalty.

The petitioners did not purchase five-eighths, but they purchased such fractional part of the whole, as would remain, after deducting from five-eighths the parcels before sold. The previous grantees and the petitioners together were the assignees of the exact and entire interest of *Dunning*, the younger. After the first grants were satisfied, the petitioners came in for the residue. They claiming to represent five-eighths, and the proprietors of the other three-eighths, made partition among themselves. After determining what should be assigned to each, mutual releases were passed, to enable the petitioners and the other co-tenants to enjoy their respective shares in severalty.

In the arrangement, certain of the small lots, into which the whole tract was divided, were assigned to the other co-tenants, as an equivalent for their releasing to the petitioners their interest in the excepted pieces. The effect of this was, that these pieces were assigned as part of the five-eighths; the owners of the three-eighths taking their share elsewhere. Thus the five-eighths became detached and severed from the three-eighths; but it was the same interest in another form. The right to make partition was incident to the estate, of which the co-tenants availed themselves in a mode, with which they were satisfied. The proportion of the petitioners was not increased, or intended to be, by the partition. The five eighths had succeeded to the whole of the excepted parcels; but it was in consideration of a release and relinquishment of that interest in other parts of the tract.

If the petitioners, having paid no new consideration, their right being derived altogether from the conveyance from *Dunning*, hold three-eighths of the excepted parcels, they would have more by so much than they purchased; and that at the expense of the prior grantees, or of *Dunning* their warrantor. If that is to be the result, at variance as it manifestly is with the source and origin of their title, the interests of some of the parties will be sacrificed, in consequence of the course pursued by the petitioners.

And if in this, they are to be aided by the technical principles of law, those principles will be perverted to a purpose, which is neither consistent with justice, nor with the fair construction of the deed, under which they claim. Technically an exception must be of part of what was previously granted, or would have been granted, but for the exception; and it is insisted, that as the three-eighths, claimed by the petitioners, never belonged to *Dunning*, the younger, they could not have been granted by him, and therefore could have formed no part of the exception. If a moiety of a tract of land in common and undivided, is granted by the owner of that proportion, which upon partition is afterwards set off in severalty, is it not the same interest? And if the grantor had taken a mortgage to secure the purchase money, would it not attach to that interest, when severed? So if the grantor had excepted from the same moiety an acre by metes and bounds, which upon partition is assigned to that interest, shall the exception be defeated? We perceive no sufficient reason why it should be. It is a distinct and determinate part of what would have been granted, but for the exception, in its new and derivative form, flowing from the right of partition, which is one of the legal incidents of the estate granted.

A conveyance of land not located, but which points out the manner in which it is to be located, is operative, and passes the land when located. *Fairbanks v. Williamson*, 7 *Greenl.* 96. There must be reasonable certainty as to the subject matter of a conveyance; and no more can be required as to the subject matter of an exception. We think the exception in the deed under consideration, should be understood to mean, that out of the five-eighths were reserved the excepted parcels, they being first assigned as a part of that interest. It would hence result, that the petitioners could not claim any part of the acre against the exception. Had the partition between the parties been made by process and judgment of law, the consequences which we have deduced, we doubt not would have been justified and required. The same result ought to flow from the mode of partition adopted. That *Thomas* and *Dudley* so understood it, may well be presumed from their long acquiescence in the claim and enjoyment in severalty of the excepted pieces by the grantees of the

younger *Dunning* and their assigns.   But if the mutual releases executed by the parties, may have left the legal title of the proportion, claimed by the petitioners in them, it may be important to view the cause in other aspects, in which it may be presented. If the meaning of the exception cannot be directly carried into effect, that its plain purport might not be defeated, the five-eighths may be understood to be conveyed to the petitioners, charged with the trust, in favor of the grantees of the excepted parcels, their heirs and assigns, that so much of the land, as might be necessary to effect the object, should be appropriated to procure the extinguishment of the interest of the other co-tenants in these parcels ; and that would still leave to the petitioners all they purchased.   It is not necessary, that such a trust should be declared by them.   It is sufficient, if it is declared by their grantor in his deed of conveyance, in which case, they would take the land charged with the trust.

No particular form of words is necessary for the creation of a trust.   It is sufficient, if the intention is clear.   4 *Kent*, 304. The excepted pieces were to be taken from the five-eighths ; and if this could not be done, but by the procurement and agency of the petitioners, it does not appear to be too much to say, that when they accepted their deed, they took the land charged with that trust.   Their title to so much as five-eighths cannot otherwise be sustained ; for they purchased that proportion, reserving therefrom the excepted pieces.   Upon this construction, the petitioners are the trustees ; and the grantees of those pieces, their heirs or assigns, the *cestuis que* trust.   In *Armstrong* v. *Pierce*, 3 *Burrow*, 1898, the court held it as a settled point, that the formal title of a trustee shall not, in an ejectment, be set up against the *cestui que* trust ; because from the nature of the two rights he is to have the possession.   *Lord Ellenborough*, however, in *Shewen* v. *Wroot*, 5 *East*, 138, thought otherwise ; and in a note to that case it appears, that the Judges were divided in opinion upon the same question, in the exchequer chamber.   But if the trustee would at law be entitled to judgment, this court, sitting as a court of chancery, would upon a proper process enjoin the execution of it against the *cestui que* trust.   *Dunlap et al.* v. *Stetson*, 4 *Mason*, 349.

If the case required it, it might deserve great consideration, whether the claim of the petitioners could be enforced, without giving effect to the consummation of a legal fraud against *Dunning* and his heirs, who are bound by his covenant of warranty, and against those claiming the excepted pieces under him.

It is very manifest that the petitioners well understood, that they had no interest in those pieces. They took no measures to assert any claim thereto until 1834, more than thirty years after the execution of the release, upon which it is now founded; notwithstanding, during all that time, they knew that sole seisin in the acre in question, was claimed and asserted by the grantee of *Dunning* or his assigns.

We proceed to the consideration of other points raised at the trial.

In 1798, *Thomas Rice* took a deed of warranty of *Dunning*, the son, of the disputed acre, who was then in the actual possession. On the part of *Dunning*, this conveyance was an unequivocal ouster of his co-tenants, from that part of the land, and a claim of sole seisin in himself. For notwithstanding the case of *Porter* v. *Hill*, 9 *Mass. R.* 34, which has reference to a case of jointenancy, it has been well settled that one tenant in common may oust his co-tenant, by resisting or denying his right, or excluding him from the enjoyment of it. *Doe* v. *Prosser, Cowper* 217; *Coke Lit.* 199 *b.* *Bracket* v. *Norcross*, 1 *Greenl.* 89; *Rickard* v. *Rickard*, 13 *Pick.* 251. And an interest thus acquired may become indefeasible, under the operation of the statute of limitations. And if the party doing the wrong may avail himself of the protection of that statute, there is much greater reason for extending it to his grantee, to whom no wrong can be imputed.

A sale by metes and bounds to a stranger is an ouster of the other co-tenants, within the principle of the authorities before cited. But *Rice* having bought of the apparent owner in possession, was no disseisor. His estate might be defeasible; but he was not a wrongdoer in making his purchase. Nor is the title he acquired subject to the strict construction, which obtains against a disseisor. *Pro. Ken. Pur.* v. *Springer*, 4 *Mass. R.* 416; same v. *Laboree et al.* •2 *Greenl.* 275. *Rice* having taken a

deed of warranty, and caused it to be recorded, his grantor being in possession, acquired a seisin, which he had a lawful right to transfer, in 1801, to *Hyde,* no adverse right or claim having in the mean time been interposed. If *Chick,* the witness, then entered and occupied part under *Hyde,* the latter was thereby seised of the whole land covered by his deed, which he had lawfully purchased, if indeed such an occupancy were at all necessary for this purpose, under the circumstances, there being no adverse possession. The jury have found that *Chick* did enter under *Hyde,* through the agency of *Thomas.* It is however insisted, that there was no evidence to be left to the jury of the agency of *Thomas* at the time. We think otherwise. He acknowledged himself to have been the agent of *Hyde* in making the purchase of *Rice,* to *Taylor* in 1802 or 1803, while *Chick* was in possession. In 1807, he put on *Harriman,* as the jury have found, in behalf of *Hyde,* and in 1810, he made a lease in writing, as his agent and attorney, of part of the land to *Reynolds.* And although *Hyde* did not recollect, that he employed *Thomas* as his agent at so early a period, there was evidence to prove that fact properly left to the jury. If the seisin was in *Hyde,* it could not be in the petitioners' releasors ; and could not therefore be acquired by their release. Whatever right, if any, that release gave them, commenced at its date ; and cannot be referred to the previous steps taken, preliminary to a partition among the co-tenants. And we are of opinion that *Thomas,* being the agent of *Hyde,* had no more right to take from a third person, a deed of land of which *Hyde* was seised, than a stranger. He only can lawfully convey, who is seised. Upon the facts therefore as found by the jury, the evidence of which was properly left to them, they were rightfully instructed, that the petitioners acquired no seisin by the release, under which they claim.

The point last under consideration, arises from a technical objection, which although available by our law, is aside from the merits of the case. There is however in the report, coupled with the finding of the jury, plenary evidence of a continued and uninterrupted seisin in *Hyde* and his assigns, for more than twenty years before the entry of the petitioners, and by which their right of entry was taken away. *Reynolds* became the tenant of *Hyde*

of part of the acre in 1810; and that tenancy continued in him and his assigns, until *Sargeant* and another purchased the same land of *Hyde*, and built a store upon it, which remained, until it was burnt in *July*, 1834, covering in the whole an uninterrupted period of nearly twenty-four years. It has been already stated, that the deed of warranty given to *Rice*, from a grantor in possession, which was duly recorded, and which enured to the benefit of *Hyde*, by a deed to him which was also recorded, followed by an entry and continued occupancy of part, if that was necessary, put the grantee and his assigns in the seisin of the whole. And being so seised, they became entitled to the protection of the statute of limitations against all conflicting rights.

It does not appear to us, that it could be any objection to the seisin of *Hyde*, that the occupancy of *Reynolds* was through the agency or by the consent of *Thomas*, or that his claim is more favorably presented, in consequence of his forbearance to assert it. The seisin of *Hyde* was necessarily adverse to any claim of seisin in *Thomas*; and not the less so, because he recognized the title of *Hyde*, and acted as his agent. The title of *Hyde* was openly asserted; and continued and preserved by the possession and occupancy of his tenants, and others claiming under him. That of *Thomas*, long abandoned, if it ever existed, has been set up, after a slumber of thirty years. Under these circumstances, and against a claim so long dormant, the respondents, in our judgment, are well entitled to the benefit of the statute of limitations. The co-tenancy of others in the *Hyde* acre has never been recognized since 1798. The conveyances, and all the facts since that period, are evidence of sole seisin in *Rice* and those claiming under him, and consequently of an ouster of the other co-tenants, up to the entry of the petitioners. The continuity of seisin under the *Rice* deed would have been broken, if the jury had found that *Thomas* put on *Harriman* in his own right, but this they have negatived. In addition to the facts adverted to in relation to *Chick*, to show the agency of *Thomas* in behalf of *Hyde*, there is in this part of the case, the evidence, that the land was known to *Harriman* as the *Hyde* acre; and that while in possession he negotiated with *Hyde* for the purchase of the part he occupied. We think therefore it was properly left to

the jury to determine, whether *Thomas* did not put on *Harriman*, as the agent of *Hyde*.

It does not appear to us to make any difference, in the deduction of title on either side, that the deed from the Commonwealth of *Massachusetts* of the *Dunning* land, was not made until 1802. The effect of that deed was, to confirm the titles, emanating from *Dunning's* heirs.

. Upon the whole, we are of opinion that the petitioners have not sustained their title, in any point of view, in which their case may be legally presented.

*Judgment on the verdict.*

---

*Mem.* During the week allotted by law to this County, but six cases, of nearly fifty standing for argument, were heard. Two of the opinions in the six cases then argued have not yet been received by the Reporter. The Court adjourned to the second Tuesday of *August* following, and then heard every case prepared for argument; and the Reporter has received opinions in most of them. These cases will follow those argued before that time in other Counties.